Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

```
ILYA TARKOV and RIMMA TARKOV,      )
on behalf of themselves, and all   )
other similarly situated           )
passengers of proposed class,      )
                                   )
                    Plaintiffs,    )
                                   )
          vs.                      ) 1:15-cv-03430
                                   )
FRONTIER AIRLINES,                 )
                                   )
                    Defendant.     )
```

Deposition of ELI TARKOV, taken before Linda M. Benda, C.S.R., Notary Public, in the County of Cook and State of Illinois, at 20 South Clark Street, Suite 2500, Chicago, Illinois, on the 9th day of August 2017, at the hour of 2:09 o'clock p.m.

EXHIBIT E

Page 2

1  There were present during the taking of
2  this deposition the following counsel:
3
4      GOROKHOVSKY LAW OFFICE, by
       MR. VLADIMIR GOROKHOVSKY
5      10919 N. Hedgewood Ln.
       Mequon, WI  53092
6      (414) 581-1582
7        On behalf of the Plaintiffs;
8
9      ADLER MURPHY & McQUILLEN, by
       MR. MATTHEW S. DOWLING
10     20 South Clark Street, Suite 2500
       Chicago, IL  60603
11     (312) 345-0700
12       On behalf of the Defendant.
13
    INTERPRETER:  Mark Leybovich.
14
    VIDEOGRAPHER:  Daniel Froman.
15

Page 3

I N D E X

WITNESS:                                PAGE
ELI TARKOV
Examination by Mr. Dowling                 7
Examination by Mr. Gorokhovsky            56
Further Examination by Mr. Dowling        67
Further Examination by Mr. Gorokhovsky    70

E X H I B I T S

Exhibit 1        18
Exhibit 2        30
Exhibit 3        33
Exhibit 4        46
Exhibit 5        49
Exhibit 6        52
Exhibit 7        53
Exhibit 8        54

Page 4

1   THE VIDEOGRAPHER:  We are going on the record at 2:09
2  p.m. on Thurs -- on Tuesday --
3   MR. GOROKHOVSKY:  Wednesday actually.
4   THE INTERPRETER:  Wednesday.
5   THE VIDEOGRAPHER:  Wednesday, August 9, 2017.  Please
6  note that the microphones are sensitive and they pick up
7  whispering and private conversations and cellular
8  interference.  Please turn off all cell phones or place them
9  away from the microphones as they can interfere with the
10 deposition audio.  Audio and video recording will continue
11 to take place unless all parties agree to go off the record.
12     This is Media Unit 1 of the video recorded
13 deposition of Ilya Tarkov taken by counsel for the Defendant
14 in the matter of Ilya and Rimma --
15  THE WITNESS:  Eli.
16  THE VIDEOGRAPHER:  -- Tarkov on behalf of themselves and
17 all other similarly situated passengers of the proposed
18 class v. Frontier Airlines filed in the United States
19 District Court for the Northern District of Illinois,
20 Eastern Division.
21     This deposition is being held at Adler Murphy
22 and McQuillen, LLP, located at 20 South Clark Street, Suite
23 2500, Chicago, Illinois, 60603.  My name is Daniel Froman
24 from the firm Veritext Legal Solutions.  I'm the

Page 5

1  videographer.  The court reporter is Linda Benda from the
2  firm Veritext Legal Solutions.  I'm not authorized to
3  administer an oath.  I am not related to any party, this
4  accident, nor am I financially interested in the outcome.
5  Counsel and all present in the room will now state their
6  appearances and affiliations for the record.
7   MR. DOWLING:  Matthew Dowling on behalf of Defendant
8  Frontier Airlines.
9   MR. GOROKHOVSKY:  Attorney Vladimir Gorokhovsky on
10 behalf of all Plaintiffs.
11  THE VIDEOGRAPHER:  Will the court reporter please swear
12 in the witness.
13 (Interpreter sworn.)
14 (Witness sworn.)
15  MR. DOWLING:  Good morning, Mr. Tarkov.
16  THE WITNESS:  Good morning.
17  MR. DOWLING:  My name is -- or good afternoon.  Sorry.
18 My name is Matt Dowling and I represent Frontier Airlines in
19 this matter.  Have you ever been deposed before?
20  THE WITNESS:  (Through Interpreter)  This is first time.
21  MR. DOWLING:  Okay.  So there's a few rules that I like
22 to go over that help the deposition go more smoothly.
23  THE WITNESS:  (Through Interpreter)  Okay.
24  MR. DOWLING:  Do you need a translator for every

2 (Pages 2 - 5)

Page 14

1  don't have my checkbook, you know.
2  Q   When you do have access to your checkbook can you
3  get me those account numbers tomorrow or Friday or next
4  week?
5  A   Oh, sure, sure, I can give you.
6      MR. GOROKHOVSKY: You need checking -- you can talk with
7  my client without my knowledge and with presence? I mean,
8  come on. How are you going to --
9      MR. DOWLING: It'll go through you.
10     MR. GOROKHOVSKY: Sure.
11     MR. DOWLING: Okay?
12 BY MR. DOWLING:
13 Q   So you held these accounts during your trip from
14 March 21st, 2015, to March 29th, 2015?
15 A   What account do you mean?
16 Q   These checking accounts and savings accounts.
17 A   Yes.
18 Q   And are these accounts where you obtained the cash
19 to pay for everything while you were in Punta Cana?
20 A   No. I -- I take cash somewhere. You know what,
21 maybe -- no. Maybe -- I cash -- yeah, sure, I cash it and I
22 took cash with me.
23 Q   Did you get that cash from those bank accounts at
24 Chase?

Page 15

1  A   I don't remember. I don't remember. Some cash I
2  have -- I keep in my house.
3  Q   Do you have any other sources of income besides
4  that check that you place into your checking account?
5  A   No, no.
6  Q   So it's more likely that you got your cash from
7  that checking or savings account?
8  A   More likely.
9  Q   Well, do you have any other bank accounts besides
10 the Chase account?
11 A   No.
12 Q   So there's no other way for you to get cash besides
13 those bank accounts, correct?
14 A   No, no.
15 Q   So you got the cash from those accounts for your
16 trip, right?
17 A   Yeah. I -- you know what, I can't remember exactly
18 what I pay by cash, what I pay by credit card. I paid -- I
19 paid by cash a lot of things. I pay credit card, and now
20 it's very hard to remember. I remember -- I remember some
21 we pay for cash, some we pay for credit card but --
22 Q   But you used the Chase account and Chase -- the
23 Chase card, credit card, and the Chase checking account to
24 pay for those expenses, correct?

Page 16

1  A   No. I -- Chase -- Chase I didn't got. I take cash
2  from Chicago. I got cash in my pocket.
3  Q   Yeah, from your Chase Bank account, correct?
4  A   Oh, sure, yeah.
5  Q   And that's how you paid for the -- whatever you
6  bought in Punta Cana, correct?
7  A   Yeah, yes.
8  Q   What did you review to prepare for this deposition?
9  Did you review anything?
10 A   Everything -- yes, yes. Everything -- my lawyer
11 showed me everything.
12 Q   What did your lawyer show you?
13     MR. GOROKHOVSKY: Counsel --
14     MR. DOWLING: I'm not going into your conversations.
15     MR. GOROKHOVSKY: Objection, attorney-client privilege.
16     MR. DOWLING: That's not attorney-client privilege.
17     MR. GOROKHOVSKY: Instructing him not to answer.
18     MR. DOWLING: You're instructing him not to answer what
19 documents he looked at --
20     MR. GOROKHOVSKY: Yep.
21     MR. DOWLING: -- to prepare for this deposition?
22     MR. GOROKHOVSKY: Attorney-client privilege.
23     MR. DOWLING: That's not attorney-client privilege.
24     MR. GOROKHOVSKY: It's client-attorney --

Page 17

1      MR. DOWLING: It's not.
2  BY MR. DOWLING:
3  Q   Are you going to take the advice of your counsel
4  and not answer?
5  A   Sure. I have to take advice from my counsel.
6  Q   Except for your attorney, who did you speak to to
7  prepare for this deposition?
8  A   Nobody.
9  Q   You didn't speak to your wife?
10 A   No.
11 Q   So what was the date that this incident occurred?
12 A   I think it was Saturday. I am not sure really
13 because it was a long time, but I -- it seems to me it was
14 Saturday.
15 Q   If I told you it was March 28th, 2015, does that
16 sound correct?
17 A   March -- it was in March. It was end of the -- end
18 of the kids' vacation, springtime, you know.
19 Q   Okay. So March 28th, 2015, would that be -- does
20 that sound right?
21 A   March 28th?
22 Q   Yeah.
23 A   I don't remember. Maybe.
24     MR. DOWLING: Okay. Mark this as Exhibit 1.

Page 22

1  A  You know what?  I don't know the reason.  Every
2 time all day -- I remember this was Saturday -- they told --
3 it's a company, you know, representative.  I really don't
4 want to take number of this company.  You know, they told,
5 wait, wait, wait, wait, wait, wait.  We wait -- we wait
6 through a lot of this, and then about 9:00 in the evening
7 they said no more, no more wait because the plane is not
8 coming, and they tell -- they tell, okay, where we have to
9 go.  They say we have to leave airport.  We cannot stay
10 overnight.  We waited for a statement and then they said,
11 okay, we've got some hotel.
12  Q  We'll get there.  We'll get there.
13  A  Okay.
14  Q  So your flight was cancelled on the 28th.
15  A  Yeah.
16  Q  It was rescheduled for the 29th.  Where did you
17 stay overnight?
18  A  Okay.  We took a taxi.  First of all, we wait for
19 our luggage because they said -- because luggage -- my
20 understanding, the plane not coming.  Luggage was in the
21 airport.  We took again our luggage and took a taxi.  We got
22 the address and we go this -- I don't know whether it's a
23 resort or hotel.  I don't remember.  And they ask come at
24 6:00 a.m. back to airport, and we came to this hotel and we

Page 23

1 stay in line till 12:00 o'clock tonight and we -- you know
2 what?  And this -- we wake up 5:00 o'clock.  We came to 6:00
3 o'clock airport because they promised, promised, promised.
4  Q  We'll talk about the next day, but you stayed at a
5 hotel --
6  A  Yes.
7  Q  -- on the night of the 28th?
8  A  Yes.
9  Q  Okay.  And you got there by taxi?
10  A  Yes.
11  Q  And the next morning did the hotel provide a
12 shuttle for you back to the airport?
13  A  No, no, nothing.  Nobody provide nothing.
14  Q  So you took a taxi back to the airport?
15  A  Yes.
16  Q  Okay.  When you got back to the airport on the
17 29th, was there any delay in the flight?
18  A  Yes.  They -- no.  They said -- they said we'll
19 be -- like they promised 28th flight will be -- will be at
20 8:00 o'clock, and when we came 6:00 o'clock or 6:00
21 something, 6:30, and you know what?  It was another problem
22 with your company.  Plane come but no team.  You know,
23 Saturday was no plane.
24  THE INTERPRETER:  No crew.

Page 24

1  THE WITNESS:  (Through Interpreter) No crew.  No crew.
2 BY MR. DOWLING:
3  Q  So it was delayed?
4  A  It's delayed again.
5  Q  But it ultimately departed.  How long was the
6 delay?
7  A  I don't remember.  Half day.  You know what?  This
8 is unbelievable, and they -- finally they said the crew was
9 coming.  You know, it's terrible.  I don't -- it's very hard
10 to me to remember this stuff.
11  Q  How much did you pay for those two taxi rides?
12  A  I don't remember.  I don't remember.  About 50
13 bucks one way, 50 -- I don't remember -- something -- 50
14 bucks or 60.
15  Q  But you don't remember?
16  A  No, I don't remember exactly.
17  Q  Did you have to pay for the hotel?
18  A  Sure.
19  Q  How much was the hotel?
20  A  Oh, I don't know.  I don't know.  A lot of money.
21 A lot of money.
22  Q  It was one night, correct?
23  A  What?
24  Q  It was one night, the hotel?

Page 25

1  A  One night hotel, yeah, one night hotel.
2  Q  Do you remember how much that one night at the
3 hotel was?
4  A  I don't remember.  It's a lot of money.  Might be
5 500, maybe 600.  I don't remember but a lot.  I don't
6 remember.
7  Q  Do you have any documents that would show how much
8 the hotel was?  Did they give you a receipt when you left
9 the hotel?
10  A  You know what, it's very -- it was -- everything
11 was -- how's it called?
12  MR. GOROKHOVSKY:  Excited.
13  THE WITNESS:  (Through Interpreter) Everybody was
14 excited, agitated.
15  THE WITNESS:  Excited, you know, excited, you know, and
16 I don't remember if we got the receipt.  We got the receipt.
17 We want to go so fast to airport and get out of there.
18 BY MR. DOWLING:
19  Q  Do you currently have a receipt for the hotel?
20  A  No.
21  Q  Did you get a receipt for the cab ride?
22  A  No.
23  Q  So you don't currently have any receipt for the cab
24 ride?

Page 26
1  A   No, I don't remember.
2  Q   So you don't have any documents to show how much
3  the hotel was?
4  A   No, no, I don't remember.
5  Q   You don't have any documents to show how much the
6  cab ride was?
7  A   Right now, no.
8  Q   Did you incur any other expenses that night? Did
9  you pay for any food?
10 A   Food, meal, you know what, everything. You know,
11 we stayed more than two days, yeah, food, meals, everything.
12 Q   How much was your food?
13 A   I don't know. I got a big appetite because I was
14 waiting for a steak.
15 Q   So you don't remember?
16 A   No, I don't remember.
17 Q   Do you not remember where you ate?
18 A   We got some restaurant in the -- before we go
19 from -- to 28th we stay almost day over there. We eat in
20 the restaurants, and then we came back on 29. We got
21 breakfast. We got lunch, and then we go to plane finally.
22 Q   So you got dinner, breakfast and lunch?
23 A   I don't think so. We got two dinners and --
24 because we stayed all day in the -- we came in the morning,

Page 27
1  28th.
2  Q   Yeah. So after the delay --
3  A   We got lunch. We got dinner over there, and then
4  after we got breakfast and we got lunch, I guess.
5  Q   But you have no documents to show how much any of
6  these were?
7  A   No, no.
8  Q   So you have no idea how much you paid for any food?
9  A   No -- roughly, I don't know. Maybe we spent $300.
10 Q   But you don't know?
11 A   I don't know.
12 Q   Do you know how you paid for this food?
13 A   Cash.
14 Q   Cash? Okay. Cash from the Chase checking account?
15 A   Maybe some I paid credit card. I don't remember
16 now.
17 Q   But either it was your Chase checking account cash
18 or your Chase credit card?
19 A   Yes.
20 Q   And the same with the hotel? How did you pay for
21 the hotel?
22 A   I don't remember. I don't remember really. I
23 think they didn't take -- something was late. I don't
24 remember.

Page 28
1  Q   But either the Chase credit card or the Chase
2  checking account?
3  A   No. I got cash. Yeah, yes.
4  Q   The cash from the Chase checking account?
5  A   Yes, yes.
6  Q   And same with the taxi? How did you pay for the
7  taxi?
8  A   Taxi, I exactly -- I paid cash.
9  Q   Paid cash?
10 A   Yeah, paid cash, yeah.
11 Q   Did you have any other expenses related to the
12 delay while you were there other than taxi, hotel and food?
13 A   I don't know.
14    MR. GOROKHOVSKY: Can we interrupt? I need the
15 restroom.
16    MR. DOWLING: After he answers the question.
17    THE WITNESS: Let me give you my memory what we got.
18 Oh, I think I have to -- I have to buy pills.
19 BY MR. DOWLING:
20 Q   Pills?
21 A   Yeah, my regular because I remember it's -- you
22 know what? Those pills was not enough for me. We were
23 afraid because I have to usually every day take some pills.
24    MR. GOROKHOVSKY: Can I interrupt? Is there a code?

Page 29
1    MR. DOWLING: It's been 30 minutes.
2    MR. GOROKHOVSKY: I need the restroom.
3    MR. DOWLING: Well, I will warn you not to talk to your
4  client.
5    MR. GOROKHOVSKY: Of course.
6    MR. DOWLING: And not to tell him what to say.
7    MR. GOROKHOVSKY: Of course.
8    MR. DOWLING: We can go off the record now.
9    THE VIDEOGRAPHER: We are going off the record at 2:38
10 p.m.
11     (Brief recess was taken.)
12   THE VIDEOGRAPHER: We are back on the record at 2:43
13 p.m.
14 BY MR. DOWLING:
15 Q   Mr. Tarkov, before our break I asked you if you had
16 any other expenses other than the food, taxi and hotel
17 related to your cancelled and delayed flight.
18 A   Expenses.
19 Q   Yes.
20 A   I said we had expenses. You know, we missed -- we
21 missed -- I remember we had tickets from theater. We missed
22 it.
23 Q   How much were those tickets?
24 A   It's about $200.

8 (Pages 26 - 29)

Page 30

1  Q   Okay. Any other expenses?
2  A   No, not as expenses. My wife -- you can tell from
3  my wife, she lost a workday.
4  Q   She lost a workday?
5  A   Yeah, Sunday.
6  Q   Did you lose any work?
7  A   No.
8  Q   So you don't have any lost income?
9  A   No, no.
10 Q   And so is that it that you can recall?
11 A   Yes.
12     MR. DOWLING: I'll mark Exhibit 2.
13         (Document marked as requested.)
14 BY MR. DOWLING:
15 Q   Showing you what's been marked as Exhibit 2. Do
16 you recognize this document?
17 A   Do I recognize the document?
18 Q   Take a look.
19 A   Yeah. I saw the paper, yeah. I saw the paper,
20 yeah. I signed it, I remember.
21 Q   You recognize this as your fifth amended complaint?
22     THE INTERPRETER: I'm sorry. Say it again.
23 BY MR. DOWLING:
24 Q   You recognize this as your fifth amended complaint?

Page 31

1  A   I don't understand this question.
2      MR. DOWLING: Vladimir, please don't talk to the
3  interpreter.
4      MR. GOROKHOVSKY: He is not correcting -- he is not
5  interpreting correctly.
6      THE WITNESS: I don't understand this question. How can
7  I -- the document. I'm not lawyer. You know what --
8  BY MR. DOWLING:
9  Q   Have you seen this --
10     THE INTERPRETER: Could you please paraphrase?
11 BY MR. DOWLING:
12 Q   Okay. Have you seen this before?
13 A   Yes.
14 Q   Okay.
15 A   But I don't know what is it about. You know what?
16 I -- you know, this is -- I didn't go --
17 Q   You filed this against Frontier Airlines, correct?
18 A   Yes.
19 Q   To initiate this action, right?
20 A   Yes, maybe. I took the lawyer and he do this. You
21 know what --
22 Q   So are you aware of what's in the complaint, the
23 contents?
24 A   You know what? You know what? This document give

Page 32

1  me my lawyer.
2  Q   Yes, but you filed it. Are you aware of what is in
3  this?
4  A   My complaint, my complaint.
5      THE WITNESS: (Through Interpreter) Yes, of course.
6  Yes. My --
7      THE WITNESS: My complaint.
8  BY MR. DOWLING:
9  Q   So you're aware of what's inside of it?
10 A   Yes, my complaint. You know what it is.
11 Q   So you're aware this was filed as a class action,
12 right?
13 A   Yes, yes, yes, the whole plane.
14     THE WITNESS: (Through Interpreter) Yes, whole
15 airplane.
16 BY MR. DOWLING:
17 Q   And so you're aware this is certified that you have
18 obligations to protect the interests of the other passengers
19 in this action?
20 A   Absolutely.
21 Q   And represent the other passengers on the flight?
22 A   Absolutely, because I saw this --
23     THE WITNESS: (Through Interpreter) He said I saw those
24 passengers.

Page 33

1      THE WITNESS: Kids and small kids and everything. You
2  know, this is what --
3      MR. DOWLING: Okay. Mark this as 3.
4          (Document marked as requested.)
5  BY MR. DOWLING:
6  Q   I'm now showing you what's been marked as Exhibit
7  3. Do you recognize this?
8  A   I remember I saw it but -- yeah, I recognize -- I
9  saw it.
10 Q   Okay. And you've seen this before?
11 A   I think so.
12 Q   And looking at Page 3 of the document, the last
13 page, is that your signature?
14 A   I don't see my signature at all.
15 Q   At the top of the page it says by Eli Tarkov?
16 A   Where is the signature? Oh, Eli Tarkov. It's just
17 printed.
18 Q   Did you sign this document, though?
19 A   I did not see it signed here. Maybe I signed it
20 but maybe it's -- I did not see this. I might sign it --
21 Q   So this isn't your actual signature on this
22 document? That's just a printed --
23 A   No, no, no.
24 Q   Okay. And this is dated -- if you look at the last

9 (Pages 30 - 33)

Veritext Legal Solutions
www.veritext.com                                      888-391-3376

Page 26

1  A  No, I don't remember.
2  Q  So you don't have any documents to show how much
3  the hotel was?
4  A  No, no, I don't remember.
5  Q  You don't have any documents to show how much the
6  cab ride was?
7  A  Right now, no.
8  Q  Did you incur any other expenses that night? Did
9  you pay for any food?
10 A  Food, meal, you know what, everything. You know,
11 we stayed more than two days, yeah, food, meals, everything.
12 Q  How much was your food?
13 A  I don't know. I got a big appetite because I was
14 waiting for a steak.
15 Q  So you don't remember?
16 A  No, I don't remember.
17 Q  Do you not remember where you ate?
18 A  We got some restaurant in the -- before we go
19 from -- to 28th we stay almost day over there. We eat in
20 the restaurants, and then we came back on 29. We got
21 breakfast. We got lunch, and then we go to plane finally.
22 Q  So you got dinner, breakfast and lunch?
23 A  I don't think so. We got two dinners and --
24 because we stayed all day in the -- we came in the morning,

Page 27

1  28th.
2  Q  Yeah. So after the delay --
3  A  We got lunch. We got dinner over there, and then
4  after we got breakfast and we got lunch, I guess.
5  Q  But you have no documents to show how much any of
6  these were?
7  A  No, no.
8  Q  So you have no idea how much you paid for any food?
9  A  No -- roughly, I don't know. Maybe we spent $300.
10 Q  But you don't know?
11 A  I don't know.
12 Q  Do you know how you paid for this food?
13 A  Cash.
14 Q  Cash? Okay. Cash from the Chase checking account?
15 A  Maybe some I paid credit card. I don't remember
16 now.
17 Q  But either it was your Chase checking account cash
18 or your Chase credit card?
19 A  Yes.
20 Q  And the same with the hotel? How did you pay for
21 the hotel?
22 A  I don't remember. I don't remember really. I
23 think they didn't take -- something was late. I don't
24 remember.

Page 28

1  Q  But either the Chase credit card or the Chase
2  checking account?
3  A  No. I got cash. Yeah, yes.
4  Q  The cash from the Chase checking account?
5  A  Yes, yes.
6  Q  And same with the taxi? How did you pay for the
7  taxi?
8  A  Taxi, I exactly -- I paid cash.
9  Q  Paid cash?
10 A  Yeah, paid cash, yeah.
11 Q  Did you have any other expenses related to the
12 delay while you were there other than taxi, hotel and food?
13 A  I don't know.
14    MR. GOROKHOVSKY: Can we interrupt? I need the
15 restroom.
16    MR. DOWLING: After he answers the question.
17    THE WITNESS: Let me give you my memory what we got.
18 Oh, I think I have to -- I have to buy pills.
19 BY MR. DOWLING:
20 Q  Pills?
21 A  Yeah, my regular because I remember it's -- you
22 know what? Those pills was not enough for me. We were
23 afraid because I have to usually every day take some pills.
24    MR. GOROKHOVSKY: Can I interrupt? Is there a code?

Page 29

1     MR. DOWLING: It's been 30 minutes.
2     MR. GOROKHOVSKY: I need the restroom.
3     MR. DOWLING: Well, I will warn you not to talk to your
4  client.
5     MR. GOROKHOVSKY: Of course.
6     MR. DOWLING: And not to tell him what to say.
7     MR. GOROKHOVSKY: Of course.
8     MR. DOWLING: We can go off the record now.
9     THE VIDEOGRAPHER: We are going off the record at 2:38
10 p.m.
11        (Brief recess was taken.)
12    THE VIDEOGRAPHER: We are back on the record at 2:43
13 p.m.
14 BY MR. DOWLING:
15 Q  Mr. Tarkov, before our break I asked you if you had
16 any other expenses other than the food, taxi and hotel
17 related to your cancelled and delayed flight.
18 A  Expenses.
19 Q  Yes.
20 A  I said we had expenses. You know, we missed -- we
21 missed -- I remember we had tickets from theater. We missed
22 it.
23 Q  How much were those tickets?
24 A  It's about $200.

Page 34

1 page or the second to last page -- sorry -- the bottom of
2 the second page dated October 14th, 2016, the bottom, that's
3 the date.
4     MR. GOROKHOVSKY: Sorry to interrupt. Can I get a glass
5 of water?
6     MR. DOWLING: Yeah. They're over there.
7 BY MR. DOWLING:
8    Q   So do you remember seeing this document around
9 October of 2016?
10   A   I don't remember. I don't remember. I don't
11 remember.
12   Q   Now, if you go back to Page 1, if you look at it --
13   A   Yeah.
14   Q   -- you see Heading No. 1 there where it says
15 damages for delay of departure of international airfare. Do
16 you see that right there, the bold and underlined --
17   A   Yes, I see.
18   Q   Damages for delay of departure of international
19 airfare?
20   A   Yes.
21   Q   Okay. So you're claiming in this document that you
22 incurred damages of $6,487.40 --
23   A   Yes.
24   Q   -- related to that delay, right?

Page 35

1   A   Yes.
2   Q   Can you break down every single dollar for me, how
3 you got to $6,487.40?
4   A   No, I cannot break it.
5   Q   You don't know?
6   A   I don't know.
7   Q   You don't know where that number came from?
8   A   This number?
9   Q   Yeah. $6,487.
10  A   I don't remember.
11  Q   You don't remember. Do you have any documents that
12 would support any bills or damages that would get you to
13 $6,487?
14  A   No, I don't have documents for this.
15  Q   And if you look there it says total actual damages,
16 $12,974.80. Do you see that?
17  A   Yeah, I see.
18  Q   How do you get there? How do you get to $12,000 in
19 damages? You need to tell me every single bill and damage
20 that you had.
21  A   Yeah, I don't remember.
22  Q   So you don't know how you got to that number?
23  A   No, I don't know.
24  Q   Okay. So you can't explain what the actual damages

Page 36

1 consist of?
2     MR. GOROKHOVSKY: Counsel --
3     THE WITNESS: Yes, exactly -- exactly of money.
4 BY MR. DOWLING:
5   Q   Yes. Tell me exactly the --
6   A   No, no. I cannot.
7   Q   Every single thing you bought or were required to
8 buy because of this delay that adds up to $12,974.80.
9   A   No, I cannot. No, I cannot.
10  Q   Did you have any medical bills while you were
11 there?
12  A   Medical over there?
13  Q   Yeah.
14  A   No.
15  Q   No?
16  A   No.
17  Q   Did your wife have any medical bills? Did she buy
18 any medications?
19  A   No.
20  Q   Okay. If you look at the bottom of Page 1 where it
21 says compensable economic damages, two, do you see that?
22 Bold and highlighted all the way at the bottom.
23  A   Yeah.
24  Q   You see that? Okay. So if you go to the second

Page 37

1 page --
2   A   Okay.
3   Q   -- it goes into your amounts for compensable
4 economic damages. You'll see 2.1 at the top of the page
5 there.
6   A   Yes, I see.
7   Q   It states $470 for compensable economic damages.
8 Can you please tell me how you get to that number, every
9 single expense that got you to $470?
10  A   What does it mean? I don't understand it.
11    MR. GOROKHOVSKY: Counselor, I think my client is a bit
12 confused. If you'll ask --
13    MR. DOWLING: Maybe I'll rephrase it for you.
14    MR. GOROKHOVSKY: If you will ask translator to
15 translate for him from English to Russian the entire
16 sentence --
17    MR. DOWLING: I can rephrase it. Let me rephrase it.
18    MR. GOROKHOVSKY: -- for compensable economic damages
19 including but not limited to per diem --
20    MR. DOWLING: Okay. Go ahead. Translate 2.1.
21    THE WITNESS: (Through Interpreter) This is what --
22 yes, meals and hotel and all that stuff.
23    THE WITNESS: I don't know what's -- my wife one day
24 work. I don't know where this come from but I --

Page 38

1 BY MR. DOWLING:
2  Q   How much did you spend in international
3 telecommunications? How much did you spend in phone calls?
4  A   In phone calls?
5  Q   Yeah. Did you make any international phone calls?
6  A   Yes. I called -- you know what, I called my
7 daughter. I don't know how much I spent. You know, I
8 called a few times. They expect us and they're supposed to
9 meet us. You know what? I called.
10 Q   What cellular device or what phone did you use to
11 make those calls?
12 A   At this time I use -- what company I use? What
13 company we got? I forgot this company. U.S. Cellular.
14 Q   How much did those phone calls amount to?
15 A   I don't remember. You know, they put bill in
16 automatically.
17 Q   So they would be on your billing statements from
18 2015?
19 A   It's including everything. My payment, they
20 didn't -- maybe it's included on my payment and everything,
21 yeah.
22 Q   So you didn't pay any more than your usual phone
23 payment?
24 A   No. I pay more but I don't know how much more. I

Page 39

1 don't remember.
2  Q   So would it be on that statement showing how much
3 more --
4  A   I think so.
5  Q   -- from 2015?
6  A   I think so.
7  Q   March or April?
8  A   Yes, I think so, yeah.
9  Q   So other than this cellular bill, how else do you
10 get to $470? Explain every single expense. Break it down.
11 This was 35, this was whatever.
12 A   I don't remember. You know what? I don't
13 remember. It's a long time ago. I don't remember.
14 Q   You don't remember. You don't have any documents
15 to show it --
16 A   No.
17 Q   -- how you get to $470?
18 A   I don't remember if I have any documents. If maybe
19 I got, I ever since threw it away, I don't remember.
20 Q   And you haven't given me or produced a single
21 document concerning any of your damages in this case,
22 correct?
23 A   What do you mean damage?
24 Q   The $470, you haven't given me a single document to

Page 40

1 show how you get there, right?
2  A   No.
3  Q   And on the first page, the $12,974.80, you haven't
4 produced a single document in this case to show how you get
5 that number, correct?
6  A   No. I don't have it now, no.
7  Q   So you have nothing to show that you actually made
8 those purchases other than your testimony today?
9  A   Right now?
10 Q   Yeah.
11 A   No. No, no.
12 Q   You don't have a single document?
13 A   No. Right now I don't have.
14 Q   Do you have documents to show?
15 A   You know what? If maybe I go home and maybe
16 I'll -- but I don't know I'll keep it. You know, this is a
17 long time ago.
18 Q   Well, you're aware we've asked for documents many
19 times over the last two years of this litigation regarding
20 your damages, and you haven't produced a single document.
21 Are you now saying that you do have documents to show?
22 A   I don't remember. Ask my lawyer. Maybe I produce.
23 I don't remember.
24 Q   I'm asking you because you would know if you have

Page 41

1 documents.
2  A   No, I don't remember.
3  Q   You don't remember or you don't have any documents?
4  A   No, I don't remember. Maybe I have. Maybe I keep
5 something but I don't remember.
6  Q   Okay. Can you look and see if you have documents?
7  A   I don't think so I can find it right now. It's a
8 long time.
9  Q   Okay. So you have nothing today for any -- no
10 documents today to prove any damages, right?
11 A   No.
12 Q   And you haven't given me any documents in the last
13 two years to prove any damages, right?
14    MR. GOROKHOVSKY: Counselor, you are badgering him. I
15 mean, that's eleven times you are --
16    THE WITNESS: I don't know.
17    MR. DOWLING: Well, he's not answering. He says he
18 doesn't remember.
19    MR. GOROKHOVSKY: He is answering, Counsel --
20    MR. DOWLING: He says he doesn't remember if he has
21 documents or he might have documents, so he's going back and
22 forth.
23    MR. GOROKHOVSKY: Counselor, let's stop badgering him.
24 I mean, you're repeating --

11 (Pages 38 - 41)

Page 42

1  BY MR. DOWLING:
2   Q   Just answer the question.  You haven't produced a
3  single document in this litigation to show any damages,
4  correct?
5       THE WITNESS: (Through Interpreter)  You mean now?
6       MR. DOWLING:  Ever.
7       THE WITNESS: (Through Interpreter)  I think so I got
8  some, but I don't know.
9  BY MR. DOWLING:
10  Q   But you haven't given me any, right?
11  A   Not you.  I maybe give my lawyer.
12  Q   So your lawyer has documents?
13  A   Maybe.  I don't remember.
14  Q   You've given your lawyer documents?
15  A   I don't remember.  I don't give you?
16  Q   Let's go down to Section 3 there where it says
17 medical, general, special, incidental and consequential
18 damages on Page 2 of Exhibit 3.  Do you see that?
19  A   Yeah.  We bought -- we bought some kind of pills,
20 and I don't have document of this.  I just tell you.  Don't
21 even ask me.  I don't have document.  We bought because I
22 regularly take pills from my high blood pressure, for my
23 prostate and for my -- and other things and because we
24 decided we -- Saturday and got -- but we're afraid we don't

Page 43

1  have enough.  Who knows where we stay?  And we bought just
2  in case because I cannot stay without these pills.
3   Q   What are the names of the medications you bought?
4   A   Micardis.
5   Q   How do you spell that?
6   A   I don't know.  Micardis.  How's -- how's --
7  how's -- you can hear how it's spelled.
8   Q   I've never heard of it.
9   A   Yeah, because too young.  Micardis.
10  Q   So you bought that while you were in Punta Cana?
11  A   Yes, and keep it in the --
12  Q   Even though you just previously told me a few
13 minutes ago that you had no medical expenses, neither did
14 your wife?
15  A   I told you we bought some when I told you we got
16 expenses.  I told you we bought some medication, pills,
17 yeah.
18  Q   So you bought $100 worth of medication?
19  A   I don't remember.  Maybe.  This is expensive.
20 Maybe.
21  Q   Do you remember how you paid for the medical --
22  A   Cash.
23  Q   Cash from your Chase checking account that you took
24 out before you left?

Page 44

1   A   Just checking account.  I don't have another
2  account.
3   Q   So it came from that account?
4   A   Yes, it came.
5   Q   Did you have any drinks while you were delayed?
6  Did you purchase any beverages?
7   A   Yes, water, you know, no vodka.  I don't drink
8  vodka.
9   Q   How much did you spend in water?
10  A   I don't know.  I don't remember.  It was too hot, I
11 know.  In Punta Cana, no air conditioning.
12  Q   But you don't remember?
13  A   No.
14  Q   You paid cash for the water?
15  A   Yeah.
16  Q   You remember that you paid cash but you don't
17 remember --
18  A   For water, sure, I paid cash.  I never paid for
19 water on credit card, my credit card.
20  Q   Okay.  And you took out all this cash before you
21 left for Punta Cana, right?  You took out the cash that you
22 used for these expenses before you left for Punta Cana, so
23 in Chicago?
24  A   No, not really this time.  I got many, many months

Page 45

1  I take some cash.  Every months I take some cash and, you
2  know, what I got at home cash, and I take it.  It's not
3  really this cash what I take before I go to Punta Cana.
4  Every months -- every months I take some cash from, every
5  single month.
6   Q   From your Chase checking?
7   A   From Chase.  No, maybe I miss one month, maybe I
8  didn't take, but some since I take I not spend it.  You know
9  what, I never do this before --
10  Q   So the cash you used on the trip you took out in
11 the months prior to the trip?
12  A   Maybe five months prior, maybe ten months prior.  I
13 don't know.
14  Q   And just to be sure, you don't have any documents
15 to show the beverages that you purchased?
16  A   No documents.  That's it.  Forget this question.
17 No documents.
18  Q   I'm going to keep asking it.
19  A   Yeah.
20  Q   Sorry.  And again what were your hotel expenses for
21 the night of the 28th to the 29th?  Do you remember how much
22 you paid for the hotel?
23  A   No.  Exactly I don't remember.  I don't remember.
24     MR. DOWLING:  Okay.  I'm going to mark this as Exhibit

12 (Pages 42 - 45)

Page 46

1  4.
2      (Document marked as requested.)
3  BY MR. DOWLING:
4     Q   Showing you what's been marked as Exhibit 4, it's
5  an E-mail dated May 5th and May 6th to a Helen Karpovich.
6  Do you recognize this E-mail?
7     A   I don't remember.
8     Q   You don't remember this?
9     A   No.
10    Q   Okay.  If you look at the bottom of the page where
11 it says please find attached letter, Re:  Frontier flight
12 cancellation, hope it can help to get good
13 reimbursement/voucher from Apple Vacation.
14        Do you remember this?  It's an E-mail.
15    A   No.  What --
16    Q   Do you remember your wife -- I think it says --
17 look at the bottom.  It says Rimma.  Do you remember your
18 wife sending this E-mail to Apple Vacation in May?
19    A   No, I don't remember.
20    Q   If you look at the third page which is marked as
21 Frontier -- Bates stamped as Frontier 67, it's an attachment
22 to the E-mail, and it looks to be a statement that your wife
23 had written and attached to this E-mail.  Do you recognize
24 this statement?

Page 47

1     A   I don't remember.
2     Q   Now, if you go to the third paragraph, third
3  paragraph, one, two, three from the top, last sentence where
4  it starts with and, of course, the hotel.  It states and, of
5  course, the hotel as well which was $115 per person.
6         Do you remember your hotel room being 115 per
7  person?
8     A   No.
9     Q   Do you have any reason to believe your wife would
10 get that wrong?
11    A   Everything's possible because she never -- she
12 never paid.
13    Q   Okay.
14    A   I always paid.  Maybe.  Maybe she --
15    Q   So she just made up 115 per person, or did you tell
16 her how much it was?
17    A   You know what?  I'm really not involved in this
18 letter.  You know, I don't know.  Maybe.
19    Q   Okay.  And if you look at the same paragraph, the
20 sentence before --
21    A   Uh-huh.
22    Q   -- next we had to find our luggage and taxi and pay
23 the $35 fare out of our own pocket.  Does that, you know --
24 do you remember the cab fare being $35 each way?

Page 48

1     A   No, no.  It was much -- well, first of all, my wife
2  never paid.  I told you.  I always paid, but I don't
3  remember.  I remember about -- about -- it's $50, and she --
4  I remember it's $50.  My wife never paid no trip.
5     Q   So she just made up $35 in May of 2015?
6     A   She -- maybe she -- maybe in her thought.  I don't
7  know.
8     Q   Maybe you told her it was $35?
9     A   No, I don't told her maybe.
10    Q   So she made it up in her E-mail and letter?
11    A   Yeah.
12    Q   Okay.  Were those the only taxis or transportation
13 you took to and from the hotel to the airport?
14    A   Yes.
15    Q   And you and your wife took the same taxi, right?
16    A   Yes.
17    Q   Now, were you -- if you look at Page 1 of this
18 exhibit, Exhibit No. 4, your wife references in the E-mail
19 hope it can help to get good reimbursement/voucher from
20 Apple Vacation.  Did you receive a voucher or other form of
21 reimbursement from Apple Vacation related to this flight?
22    A   No, I don't think so but I don't remember, no.
23    MR. DOWLING:  Mark this as Exhibit 5.
24        (Document marked as requested.)

Page 49

1  THE WITNESS:  I don't remember.
2  BY MR. DOWLING:
3     Q   Showing you what's been marked as Exhibit 5, a
4  letter from Apple Vacations?
5     A   Yeah.
6     Q   Do you recognize this?
7     A   No, I don't remember.  Maybe my wife might
8  recognize.  I don't --
9     Q   Okay.  If you look at the top right above where it
10 says Dear Helen where it says Re, it says booking and then a
11 number and then ORD Punta Cana March 21st, 2015 --
12    A   Yeah.
13    Q   Tarkov, Eli and Rimma.
14    A   Yeah, yes.
15    Q   Is that correct?
16    A   Sure.
17    Q   If you go down to the fourth paragraph, the first
18 sentence --
19    A   Yeah.
20    Q   -- where it states while we're unable to proceed
21 with a refund we would like to offer your clients vacation
22 certificates in the amount of 75 per person which are
23 enclosed with this letter; is that correct?
24    A   Maybe, maybe.  I don't remember.

13 (Pages 46 - 49)

Page 50

1 Q If you look at Page 2 of this document --
2 A Yeah. I don't really --
3 Q -- you'll see two $75 vacation certificates from
4 Apple Vacations; is that correct?
5 MR. GOROKHOVSKY: Counsel, hold on a second. You're a
6 little bit misleading in your questioning of my client.
7 Those are certificates toward purchasing of next airfare
8 from Apple.
9 MR. DOWLING: As I said --
10 MR. GOROKHOVSKY: It's not a --
11 MR. DOWLING: As I said, vacation certificate.
12 MR. GOROKHOVSKY: It's not a compensation -- it's not a
13 money -- vacation certificates to be used only toward the
14 reservation with Apple.
15 MR. DOWLING: Vladimir, do you have an objection or are
16 you --
17 MR. GOROKHOVSKY: Yes, it's objection. Yes.
18 BY MR. DOWLING:
19 Q Did you receive these vacation certificates for $75
20 each?
21 A I think so, maybe. It's maybe my wife, but I think
22 we received, yeah.
23 Q Okay.
24 A Yes. I remember. I remember.

Page 51

1 Q Is Helen Karpovich your travel agent in Buffalo
2 Grove?
3 A I don't remember who was. We got few. Every time
4 we change.
5 Q Do you remember -- does her name ring a bell? Do
6 you remember her name, Helen Karpovich?
7 A Helen Karpovich?
8 Q Yeah.
9 A I don't remember. I don't remember. Maybe she
10 was.
11 Q And did you use these vouchers, the $75 vouchers,
12 vacation certificates given to you by Apple Vacation?
13 A Yes, yes, yes.
14 Q You used them?
15 A Yes, we use them.
16 Q So you used $150 total, the two 75 together?
17 A Only for 75 plus 75, 150.
18 Q Yes. Moving on, you said you didn't lose any
19 earnings from the delay. You had no lost income, correct?
20 You didn't miss any work?
21 A No, no, no, no.
22 Q So you had no lost income?
23 A Yes.
24 Q Let's go back to Exhibit 3 for just one minute.

Page 52

1 THE INTERPRETER: This is 4 and this is 3.
2 THE WITNESS: Yeah.
3 BY MR. DOWLING:
4 Q If you look at the bottom of Page 2, Exhibit 3 is
5 the statement of pecuniary damages. If you look at the
6 bottom of Page 2 where it says total amount of cognizable
7 compensatory damages, $29,701.23, do you see that?
8 A Yes.
9 Q Can you account for each and every specific expense
10 you incurred that added up to $29,701.23?
11 A No.
12 MR. DOWLING: Okay. I'm marking as Exhibit 6. Thank
13 you.
14 (Document marked as requested.)
15 BY MR. DOWLING:
16 Q Take a look at this document. It's titled amended
17 answer of Plaintiffs Ilya -- Eli -- sorry -- Eli Tarkov and
18 Rimma Tarkov to Defendant's interrogatories. Do you
19 recognize this document?
20 A I saw it. I remember -- I don't remember but I saw
21 it.
22 Q You've seen it?
23 A Yeah, something.
24 Q Did you sign this document?

Page 53

1 A Maybe. I don't remember. I don't know. If my
2 lawyer give me I sign. If he didn't give me I didn't sign.
3 Yeah, I sign. It's right here, my sign.
4 Q On Page 18?
5 A Yes, yes. That's my sign.
6 Q Where were you when you signed these documents, do
7 you remember?
8 A I --
9 Q Yeah.
10 A -- was home.
11 Q Okay. And did you review your answers to these
12 interrogatories before you signed it?
13 A Yeah. I look around. I ask my lawyer and talking.
14 Q Okay. And did you provide truthful answers to
15 these interrogatories? Are they the truth, truthful?
16 A Oh, yes, yes, I think so.
17 Q So these answers are accurate to your knowledge?
18 A I think so.
19 MR. DOWLING: Mark this as 7.
20 (Document marked as requested.)
21 BY MR. DOWLING:
22 Q I'm giving you what's marked as Exhibit 7. It's
23 Plaintiffs' second verified response to Defendant's second
24 set of interrogatories. Do you recognize this document?

Page 54

1  A  Something that I saw in here, no, this is very hard
2  for me. I saw it.
3  Q  So you've seen it before. Did you sign these --
4  this document?
5  A  Yeah, I signed it, yeah.
6  Q  So looking at Page 5, is that your signature?
7  A  Sure.
8  Q  And did you review your answer before you signed
9  it?
10  A  You know what? I asked my lawyer everything and he
11  said it's everything. I -- very hard to understand this,
12  what is this, you know.
13  Q  So you did review it or you did not review it?
14  A  Yeah, I review it but maybe I did not understand
15  everything, but I reviewed it.
16  Q  And to your knowledge are these answers accurate?
17  A  In my understanding, yes.
18  MR. DOWLING: Mark this as 8.
19       (Document marked as requested.)
20  BY MR. DOWLING:
21  Q  I'm now showing you what's been marked as Exhibit 8
22  which is Plaintiffs' response to Defendant's request for
23  admission pursuant to Rule 36. Do you recognize this
24  document?

Page 55

1  A  Maybe, yeah.
2  Q  Do you recognize it?
3  A  I hope so.
4  Q  Have you seen this before?
5  A  I don't remember. I don't remember. I don't know.
6  I don't remember.
7  Q  So you don't remember if you've seen this before or
8  not?
9  A  I don't remember I see it. Too many papers.
10  Q  If you go to Page 2 of the document, the first
11  paragraph, it says Plaintiff Eli Tarkov incurred a hotel
12  expense totaling no more than $115 as a result of the
13  incident. If you look at your response there where you
14  admitted that, so you admit that you didn't incur more than
15  $115 for a hotel as a response to -- as a result of the
16  incident?
17  A  $115.
18  Q  Yeah.
19  MR. GOROKHOVSKY: Hotel expense. It's hotel expense.
20  MR. DOWLING: So these are questions we ask.
21  THE WITNESS: $115 -- $115 for what?
22  BY MR. DOWLING:
23  Q  These are questions we sent to your attorney and he
24  provided us answers, and they're your answers. I just want

Page 56

1  to know are these accurate. Did your attorney provide
2  accurate answers in here?
3  A  Yes.
4  Q  So your attorney provided accurate answers?
5  A  Yes, yes.
6  Q  Have you ever filed a lawsuit prior to this
7  lawsuit?
8  MR. GOROKHOVSKY: What is the relevance?
9  MR. DOWLING: It's relevant to --
10  MR. GOROKHOVSKY: To what? To nothing.
11  MR. DOWLING: Are you telling him not to answer that?
12  MR. GOROKHOVSKY: No. He may answer it.
13  BY MR. DOWLING:
14  Q  Have you ever filed a lawsuit prior to this suit?
15  A  Never.
16  MR. DOWLING: Just give me a minute.
17  MR. GOROKHOVSKY: Are you done? I have --
18  MR. DOWLING: Yes.
19  MR. GOROKHOVSKY: May I proceed with my cross?
20  MR. DOWLING: Yes.
21  MR. GOROKHOVSKY: Thank you.
22       EXAMINATION
23       by Mr. Gorokhovsky:
24  Q  Ilya, you have testified that you've had tickets

Page 57

1  for a theatrical performance, right?
2  A  Yeah, I remember, yeah, yeah.
3  Q  And you testified that you have spent $200. Is it
4  for both or for one?
5  A  For both.
6  Q  200 for both, right?
7  A  Yes, for both.
8  Q  Okay. Also is that true that this entire ordeal on
9  20 -- started earlier with your departing flight from
10  Chicago on 21st which was also delayed on the departure for
11  more than three hours, right?
12  A  Yes.
13  Q  So you've been delayed on departure from Chicago to
14  Punta Cana, right?
15  MR. DOWLING: Objection, leading.
16  THE WITNESS: Yeah. I don't remember. Yeah, same. It
17  was, yeah, same.
18  BY MR. GOROKHOVSKY:
19  Q  Right. And do you remember for how long?
20  A  Yeah. We stay -- I stay and you know what? I
21  remember when we came in Punta -- from Punta Cana on Sunday,
22  Sunday, 29th, I think, we stay -- we stay in plane about
23  three hours because for this plane they don't have a gate.
24  Q  I'm asking you on the flight departing from Chicago

Page 58

1 to Punta Cana on the 21st, was that flight delayed as well?
2  A  Yes, yes.
3  Q  On the departure, right?
4  A  Yes, yes.
5  Q  For how long?
6  A  I don't remember but it's not for long.
7  Q  One hour, two hours?
8  A  Maybe two or three hours.
9  Q  More than three hours?
10  A  About this, yeah.
11  Q  So is it fair to say that you arrived late to Punta
12 Cana for your vacation?
13  A  True.
14  Q  Did you miss any time of your vacation because of
15 that late flight from Chicago to Punta Cana?
16  A  No. I miss -- I miss bus. I miss bus and then
17 because we -- in this time we did not go to -- it not was a
18 trip. It was a private to my daughter.
19  Q  Did you -- how did you arrive to hotel from Punta
20 Cana airport? By the taxi or by shuttle?
21  A  No. From Punta Cana I go by the taxi.
22  Q  No, no. Okay. From Punta Cana airport to hotel at
23 Punta Cana.
24  A  It was not hotel. It was -- it's my daughter and

Page 59

1 she lives with family. She take care. I forgot this. It's
2 not resort. It's a rented house. They rent it and I go and
3 spend -- one week we spend with my daughter. It's not a
4 resort.
5  Q  But your arrival from Chicago to Punta Cana was
6 late on the 21st, right?
7  A  Yeah. It was late but a few hours.
8  Q  What is your definition of few hours? Is it three
9 plus, two plus, one plus?
10  A  I don't remember. It's about three hours, three
11 plus maybe.
12  Q  Three plus hours?
13  A  Yeah, three plus but I don't remember.
14  Q  Did you incur any damages as to the result of that
15 flight, of that delay from Chicago to Punta Cana on the
16 21st?
17  A  Damages is my kids didn't -- they didn't meet me,
18 so I have to took a taxi and go in this place where they
19 live because they got little kids. They cannot wait me.
20  Q  So in essence you missed time with your family in
21 Punta Cana, right?
22  A  Sure, I miss.
23  Q  So you missed vacation time, right?
24  A  Yes.

Page 60

1  Q  Which was a purpose of you going to Punta Cana to
2 begin with, right?
3  A  Yes, yes. I spend my time because it was
4 springtime, you know what, that I'm supposed to spend with
5 my family.
6  Q  Is it fair to say that during that trip from
7 Chicago to Punta Cana and from Punta Cana to Chicago your
8 air flight -- air flights there delayed on several occasions
9 and was cancelled on one occasion, so it's multiple delays
10 and one cancellation; fair to say?
11  A  Yes, yes, sure.
12  Q  So first delay of the departure from Chicago to
13 Punta Cana on 21st, right?
14  A  Yes.
15  Q  And you missed a time with your family as a result
16 of it, right?
17  A  Absolutely.
18  Q  So you missed vacation time?
19  A  Yes.
20  Q  Second delay is the 28th from Punta Cana to
21 Chicago, right?
22  A  Yes.
23  Q  Fair to say?
24  A  Yes.

Page 61

1  Q  And that delay resulted in cancellation, right?
2  A  Yes, cancellation. It was --
3  Q  On the 28th, right?
4  A  Yes.
5  Q  Then you came back to the airport on -- 6:00 a.m.
6 on the 29th, right?
7  A  Yes.
8  Q  As ordered, right?
9  A  Yes.
10  Q  And as promised, right?
11  A  Absolutely.
12  Q  And again your flight did not depart, right, on the
13 29th as promised, right?
14  A  Yes.
15  Q  And what was the duration of that third delay?
16  A  Because they didn't have a team, the team.
17  Q  So for how long did you wait?
18  A  Okay. From 6:00 o'clock, I think, to -- I don't
19 remember. For -- to 1:00 o'clock, I think, to 1:00 o'clock,
20 something like that.
21  Q  In your wife's letter to the -- to the Apple
22 Vacation she represented to Apple that as a result of the
23 delay you've been subjected to the diarrhea and vomiting,
24 right?

Page 62

1  A   Yeah. I got little bit, yeah.
2  Q   So when did the diarrhea started?
3  A   Diarrhea started, I remember -- I don't remember.
4 It started --
5  Q   Is it started on 21st or on the 28th?
6  A   No, no, no, no. It's when we go back.
7  Q   I see. So 28th, right?
8  A   Yes, I think so.
9  Q   And for how long did the diarrhea -- your diarrhea
10 lasted, for how many days?
11  A   Next day it was better. Next day I feel better.
12  Q   Did it obstructed you from going to work after your
13 arrival to Chicago?
14  A   No.
15  Q   But it caused you suffering, right?
16  A   Yes.
17  Q   Physical suffering, right?
18  A   Yes.
19  Q   And vomiting as well, right? You understand
20 vomiting, right?
21  A   Yes, yes.
22  Q   And as to the hotel, what is your -- the price of
23 the hotel? What is your best recollection?
24  A   I don't remember. You know, it's my wife who said

Page 63

1 $115 per person. I really don't remember. You know, this
2 is -- maybe she -- because she never pay. I paid. And I
3 think it was more expensive, but it's --
4  Q   How more do you remember paying?
5  A   I think -- I think we both paid -- I said we paid
6 200 per person because this is -- this hotel was included
7 but we did not use it. It not was a hotel. It was a
8 resort. It was a resort and they charge it for one day. We
9 stay one day, but we stay from 12:00 p.m. to 6:00 a.m. You
10 know what, this -- but we never use this meals. It's
11 supposed to be included.
12  Q   Have you had a diarrhea while in hotel?
13  A   Just little bit, you know. In the morning I feel
14 better.
15  Q   How much time (sic) did you spend for the food on
16 the 28th?
17  A   I don't remember. You know, this is very hard --
18  Q   $100, $200?
19  A   Cash.
20  Q   $300?
21  A   I think -- I think maybe we got -- we go in the
22 restaurant and then we go for lunch and then go for a
23 dinner. We buy water. We buy -- we bought snacks. I don't
24 know. Maybe 200, 250. I don't know. This is very hard to

Page 64

1 tell. It's a long time.
2  Q   Is it less than 250, 250 sharp or more than 250?
3  A   We got dinner. We got lunch. We got -- maybe it's
4 more than 250.
5  Q   And then you missed theatrical performance and --
6  A   Yes. This was something we didn't go, you know,
7 because we --
8  Q   Actually wasting the tickets, right?
9  A   Yes.
10  Q   And you didn't lose any time of work, no?
11  A   What do you mean?
12      MR. DOWLING: Objection, asked and answered multiple
13 times.
14 BY MR. GOROKHOVSKY:
15  Q   Did you lose any time from work?
16      MR. DOWLING: Objection, asked and answered.
17      THE WITNESS: No.
18 BY MR. GOROKHOVSKY:
19  Q   And do you remember how much you paid for telephone
20 calls? Was it $100, $200, $50, 25?
21  A   I don't remember because I call and I didn't figure
22 out. Bills go automatically and I didn't --
23  Q   So you just dial buttons on your cell phone or you
24 purchased air -- you purchased --

Page 65

1  A   No, no, no. I got -- in this time we got -- like
2 it's roaming. I think I remember roaming. It was a roaming
3 bill from this company, and I called and they charged the
4 roaming. I don't remember how much.
5      MR. GOROKHOVSKY: Counsel, I need restroom but I'll not
6 be leaving yet. I'll be back. Give me one minute.
7      THE VIDEOGRAPHER: We are going off the record at 3:37
8 p.m.
9      (Brief recess was taken.)
10      THE VIDEOGRAPHER: We are back on the record at 3:42
11 p.m. This is Media Set 2.
12 BY MR. GOROKHOVSKY:
13  Q   Okay. Mr. Tarkov, going back to the diarrhea
14 issue, do you think that the diarrhea was caused by the
15 delay?
16  A   It's possible.
17  Q   Possible?
18  A   Possible, yeah, because, you know, I eat in -- you
19 know, in the hotel, in the airport, you know, because they
20 didn't have --
21  Q   So the delay created physical inconvenience for
22 you, right?
23  A   Absolutely.
24  Q   Absolutely. Okay. Now, do you remember when we

17 (Pages 62 - 65)

Page 66
1 started that -- we had a conversation concerning liability
2 of airline for the damages to each passenger, and I told you
3 that approximate amount of damages which you can recover per
4 passenger is about 4,600 SDRs, certificates of international
5 deposit, which is about 600 -- which was about 600 --
6 6,487.40 at that particular time. Do you remember that?
7　A　Yes.
8　Q　That is why that exhibit -- Plaintiffs' statement
9 of pecuniary damages, Exhibit No. -- what exhibit? No. 3?
10　MR. DOWLING: Objection, leading.
11　MR. GOROKHOVSKY: I'm asking you, Exhibit -- is it
12 Exhibit --
13　MR. DOWLING: 3. There's an objection, leading, to your
14 question to the witness.
15 BY MR. GOROKHOVSKY:
16　Q　Okay. So directing your attention to Exhibit 3,
17 Paragraph 1.1 at the end of the paragraph, total amount of
18 actual damages, do you see that?
19　A　Here it is.
20　Q　Okay. So 12,974.80, do you see that?
21　A　Yes.
22　Q　So it is for two passengers, right, for you and for
23 your wife, right?
24　A　Yes.

Page 67
1　Q　It is 6,487.40 multiplied by two, right?
2　A　Yes.
3　Q　In essence for two passengers, right?
4　A　Yes.
5　MR. GOROKHOVSKY: Nothing further.
6　MR. DOWLING: Okay. I have some questions now.
7　　　　FURTHER EXAMINATION
8　　　　by Mr. Dowling:
9　Q　Your attorney asked you questions about a delay on
10 August 21st, and you said you don't -- didn't remember how
11 long the delay was, and you said it was more than three
12 hours. What expenses did you incur during that three-hour
13 delay?
14　A　Expenses?
15　Q　Yes.
16　A　Exactly dollars?
17　Q　Yes, exact dollars.
18　A　I bought some food in the plane.
19　Q　How much?
20　A　I don't remember.
21　Q　Do you have receipts for that?
22　A　No.
23　Q　Any other expenses as a result of that day -- that
24 delay?

Page 68
1　A　I paid for taxi because my kids cannot meet me.
2　Q　How much?
3　A　I don't remember what it was. I don't remember
4 what it was.
5　Q　Do you remember if you paid in cash or credit card?
6　A　Cash. I did not pay credit card.
7　Q　And that's the only expenses that you incurred as a
8 result of the delay, food and taxi?
9　A　Yeah. Just what he said, I lost my time with my
10 family.
11　Q　Do you have any exact economic damages for that
12 missed time?
13　A　What do you mean economic?
14　Q　Money damages.
15　A　Money damages, no.
16　Q　Your attorney stated that he told you at the
17 beginning of the lawsuit how much you could recover,
18 $6,487.40. What else did your attorney tell you at the
19 beginning of the lawsuit?
20　MR. GOROKHOVSKY: Objection, attorney-client privilege,
21 instructing you not to answer.
22　THE WITNESS: Objection.
23　MR. DOWLING: I'm going to say that you -- on the record
24 that you waived that attorney-client privilege by going into

Page 69
1 your actual discussions of what you told him at the
2 beginning of the lawsuit.
3　MR. GOROKHOVSKY: Only as to the limits of liability,
4 that's it.
5 BY MR. DOWLING:
6　Q　Your attorney stated the $6,487.40 was some number
7 he told you you could recover, but if you look at Exhibit 3,
8 1.1, it says $6,487.40 per passenger in compensable economic
9 damages, medical bills and inconvenience damages for --
10 causing financial injury. You don't have any records of
11 those expenses, correct?
12　MR. GOROKHOVSKY: Asked and answered, objection.
13 BY MR. DOWLING:
14　Q　You already stated that you don't have any records
15 of any of those expenses, correct?
16　MR. GOROKHOVSKY: Counsel, you're just wasting time.
17 You asked it --
18　MR. DOWLING: You brought it up again. Let the witness
19 answer and then we can get out of here.
20　MR. GOROKHOVSKY: Okay.
21 BY MR. DOWLING:
22　Q　You don't have any documents supporting those
23 damages, right, as you stated previously?
24　A　Right now?