Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

```
ILYA TARKOV and RIMMA TARKOV,      )
on behalf of themselves, and all   )
other similarly situated           )
passengers of proposed class,      )
                                   )
                    Plaintiffs,    )
                                   )
        vs.                        ) 1:15-cv-03430
                                   )
FRONTIER AIRLINES,                 )
                                   )
                    Defendant.     )
```

Deposition of RIMMA TARKOV, taken before Linda M. Benda, C.S.R., Notary Public, in the County of Cook and State of Illinois, at 20 South Clark Street, Suite 2500, Chicago, Illinois, on the 9th day of August 2017, at the hour of 3:59 o'clock p.m.

EXHIBIT F

Page 2

1  There were present during the taking of
2  this deposition the following counsel:
3
4      GOROKHOVSKY LAW OFFICE, by
         MR. VLADIMIR GOROKHOVSKY
5      10919 N. Hedgewood Ln.
         Mequon, WI  53092
6      (414) 581-1582
7         On behalf of the Plaintiffs;
8
9      ADLER MURPHY & McQUILLEN, by
         MR. MATTHEW S. DOWLING and
10     MR. BRIAN MAYE
         20 South Clark Street, Suite 2500
11     Chicago, IL  60603
         (312) 345-0700
12
            On behalf of the Defendant.
13
14  INTERPRETER:  Mark Leybovich.
15  VIDEOGRAPHER:  Daniel Froman.

Page 3

1              I N D E X
2
3  WITNESS:                              PAGE
4  RIMMA TARKOV
5  Examination by Mr. Dowling              7
6  Examination by Mr. Gorokhovsky         54
7  Further Examination by Mr. Dowling     58
8
9
            E X H I B I T S
10
   Exhibit 1                              -
11
   Exhibit 2                              27
12
   Exhibit 3                              28
13
   Exhibit 4                              17
14
   Exhibit 5                              45
15
   Exhibit 6                              47
16
   Exhibit 7                              48
17
   Exhibit 8                              49

Page 4

1      THE VIDEOGRAPHER:  We are going on the record at 3:59
2  p.m. on Wednesday, August 9th, 2017.  Please note that the
3  microphones are sensitive and they pick up whispering,
4  private conversations and cellular interference.  Please
5  turn off all cell phones or place them away from the
6  microphones because they can interfere with the deposition
7  audio.  Audio and video recording will continue to take
8  place unless all parties agree to go off the record.
9      This is Media Unit 1 of the video recorded
10 deposition of Rimma Tarkov taken by counsel for the
11 Defendant in the matter of Ilya Tarkov and Rimma Tarkov on
12 behalf of themselves and all other similarly situated
13 passengers of the proposed class v. Frontier Airlines filed
14 in the United States District Court for the Northern
15 District of Illinois, Eastern Division.
16     This deposition is being held at Adler Murphy
17 and McQuillen, LLP, located at 20 South Clark Street, Suite
18 2500, Chicago, Illinois, 60603.  My name is Daniel Froman
19 from the firm Veritext Legal Solutions.  I'm the
20 videographer.  The court reporter is Linda Benda from the
21 firm Veritext Legal Solutions.  I'm not authorized to
22 administer an oath.  I'm not related to any party in this
23 action, nor am I financially interested in the outcome.
24     Counsel and all present in the room will now

Page 5

1 state their appearances and affiliations for the record.
2     MR. GOROKHOVSKY:  Attorney Vladimir Gorokhovsky of
3 Gorokhovsky Law Offices, LLC, for the Plaintiffs.
4     MR. DOWLING:  Matthew Dowling on behalf of Defendant
5 Frontier Airlines.
6     THE VIDEOGRAPHER:  Will the court reporter please swear
7 the witness?
8 (Witness sworn.)
9     THE WITNESS:  Actually maybe it will be faster if only I
10 can use interpreter when I don't understand.
11    MR. DOWLING:  Yeah.
12    THE WITNESS:  Nothing against you.
13    THE INTERPRETER:  No problem.
14    THE WITNESS:  Just little faster --
15    MR. GOROKHOVSKY:  Just like your --
16    MR. DOWLING:  No worries.
17    MR. GOROKHOVSKY:  -- husband was here before, yeah.
18 Okay.  No problem.
19    MR. DOWLING:  Yeah, we can definitely do that.
20    THE WITNESS:  Right.
21    MR. DOWLING:  So my first question for you is have you
22 ever taken part in a deposition before?  Have you ever had
23 your deposition taken before?
24    THE WITNESS:  No.

2 (Pages 2 - 5)

Page 14

1 something like big secret, and we didn't know that and it
2 was very tough to watch when you don't know what is next.
3 They said, yeah, we will -- it's going to be delayed,
4 delayed. Until everybody is exhausted and then they say it
5 totally cancelled and no one knew the reason why it was
6 cancelled. We were asking the reason and it was no reason.
7 It was one of the doctors between passenger and he was very,
8 you know, like an activist and he was going back and forth.
9 Passengers with kids, everybody hungry, tired. We want to
10 go back to USA and we don't know where we are until they
11 say, yeah, we will give you -- there is cancelled flight.
12 We will give you the luggage, and you have to grab a taxi
13 and hopefully the Apple Vacation will find you a place to
14 stay the night because you cannot stay at the airport. It's
15 against the law, and I never forget in my life, you know,
16 this -- I'm sorry to say this -- this hotel. I mean, I
17 forgot the name. Barcelo -- something Barcelo Maya Beach or
18 something. It was awful. It was unsanitary. I sit -- sat
19 on my bed all night, did not -- because I saw cockroaches
20 sizes like this, and my suitcases were like -- I put them
21 high up and closed. I was so terrified to bring this
22 horrible bed insects back to my country, into my home and
23 into my life, so it was -- and then --
24   Q   Well, we'll --

Page 15

1   A   I'm sorry.
2   Q   We'll get into that.
3   A   Yeah.
4   Q   So on March 28th the flight was cancelled. It
5 departed the next day, the 29th?
6   A   Departed next day. It was not an easy departure.
7   Q   But it arrived in Chicago on the 29th, right?
8   A   We arrived to Chicago at probably around 4:00 p.m.,
9 something. It was very late, too, because it was another
10 problem. It was no gate. It was -- just ask me questions
11 and I'll be answering. Otherwise I'll go on and on.
12   Q   You arrived in Chicago that day? That was the
13 question.
14   A   We arrived on the 29th to Chicago, and it was
15 around 4:00 p.m. I don't remember exactly.
16   Q   And you don't know the reason for the cancelling --
17 cancellation of the flight on the 28th?
18   A   At the time, no. No one told us anything.
19   Q   Do you know now?
20   A   Because when I -- I think that this guy who was,
21 you know, an activist, he said there was some problem with
22 the tower, but why it's only our flight was on, you know,
23 airport. Everybody else left. So from my understanding, if
24 tower not working, no one can fly. I'm not, you know, an

Page 16

1 airplane expert but that's what I understand.
2   Q   So you were told it was something with the tower?
3   A   Yes.
4   Q   And you mentioned that you stayed at a hotel on the
5 night of the 28th?
6   A   Uh-huh.
7   Q   Apple Vacation set that up for you, right?
8   A   Yes, they did it.
9   Q   Not Frontier?
10   A   I don't know actually exactly. I don't remember.
11 I don't want to be, you know -- no, I don't think that's
12 Frontier.
13   Q   So is it your understanding Apple Vacation set up
14 that hotel?
15   A   That's what my memory -- my recall.
16   Q   How did you get to the hotel on the 28th?
17   A   They told us that we have to grab taxi and
18 everything at our expense, taxi and hotel and --
19   Q   How much did you pay for the taxi to the hotel on
20 the 28th?
21   A   My husband paid everything, so --
22   Q   So you don't know?
23   A   I don't remember. I mean, I don't remember.
24   Q   How much was the hotel for that night?

Page 17

1   A   It was a lot. It was more than $100. I know that
2 it was a lot for the one night that I didn't sleep and sat
3 on my bed.
4   Q   Do you have any documents to show the expenses for
5 the hotel?
6   A   I think we did some copies of the receipts, I
7 think, because they told us to bring all your receipts back.
8   Q   Who did you give those receipts to?
9   A   To the Apple Vacation person who booked our trip.
10   Q   Who was that?
11   A   Helena, I think, Helena.
12   Q   Helen Karpovich?
13   A   Helen is Helena in Russian. Right, right. Thank
14 you. We don't travel lately so I forgot her name.
15   Q   Okay. If you take a look at Exhibit 4, it should
16 be in front of you, previously marked as Exhibit 4.
17   A   This is Exhibit 4.
18   Q   Yes. Do you recognize this document?
19   A   Who is Leticia? Good morning, Helen. I'm
20 copying -- no, I don't know what is this.
21   Q   Keep going down --
22   A   I know Helen Karpovich. Maybe she was talking to
23 somebody else, Leticia, but --
24   Q   If you go down on the bottom --

Page 22

1  I'm not sure, but hotel was Visa because I remember him
2  giving card, but I don't remember --
3      Q    So you should be able to go back and look at your
4  statements and see how much the hotel was, correct?
5      A    He can do it.  I mean again --
6      Q    Your husband?
7      A    Yeah.  I -- see, I'm taking care of other parts of
8  family life.
9      Q    That's fine.  So did you pay for any food while you
10 were there?
11     A    Yes.  We were very hungry.  We had to eat.
12     Q    How much was the food?
13     A    I don't know.  He paid.
14     Q    Do you know how he paid?
15     A    And actually he had this bad stomach issue and
16 diarrhea after this horrible --
17     Q    I understand.  I asked how he paid.
18     A    But I don't know.  How he paid, probably cash
19 because he did not trust all these vendors at the airport to
20 give them card, only cash.
21     Q    Do you know how many meals you had?
22     A    Well, probably three because we arrived very early.
23 They like, you know, throw us from the hotel at 6:00 a.m.
24 in the morning stating that our flight at 8:00 and they lied

Page 23

1  again.  Everything was closed.  We couldn't go eat, drink.
2  We were -- the only -- thank God bathroom were open.
3      Q    From the 28th to the 29th how many meals did you
4  purchase?
5      A    I don't remember.  I know that we had to eat.  I
6  don't remember how many meals.
7      Q    And you don't remember the cost of those total
8  meals?
9      A    No, not at all.  Sorry.
10     Q    You mentioned your husband's diarrhea.  Did you
11 have to pay for anything related to that diarrhea, pay for
12 any medications?
13     A    I bought some -- at the airport I bought some
14 Cipro, I believe, to give him because I was afraid of bad
15 food poisoning and --
16     Q    Was that on the 29th?
17     A    After we ate at this horrible hotel, so it was --
18 at night he had discomfort.  In the morning he complained.
19     Q    Do you know how much that medication was that you
20 bought at the airport?
21     A    No, I don't remember.
22     Q    Would you have a receipt?
23     A    No.  For that I don't have a receipt.  Probably I
24 don't.  I mean, for this I wouldn't really think it

Page 24

1  necessary.
2      Q    And you don't remember how you paid, cash or credit
3  card for that medical --
4      A    Again we were afraid to give -- probably it was
5  cash.  He paid probably cash because I was afraid to give
6  credit card at this small, you know, booth.
7      Q    Did you have any other financial losses related to
8  your delayed return?  Did you lose any other monetary money?
9      A    We cancelled something.  We were supposed to go to
10 the -- I think we had plans to go somewhere on Sunday and I
11 was exhausted and just sick of everything, and we didn't go.
12 Was it a play or -- I don't remember exactly.  I think it
13 was a play, musical.  I don't remember.
14     Q    What was the cost of missing --
15     A    He paid.  He did the surprise.  He said it's a
16 surprise waiting when we come home.  Again he did it.
17     Q    So you don't remember?
18     A    No, no.  I just remember being sick.
19     Q    And you don't know how he paid?
20     A    No, I don't know.
21     Q    Did you miss any work as a result of the delay?
22     A    I couldn't -- I called my work, I believe, if I
23 recall correctly, and I just said I couldn't sleep all
24 night.  I said I come a couple hours later, few hours later.

Page 25

1  That's what -- again I not -- I do not remember exactly.
2      Q    A few hours later on Monday?
3      A    Monday.
4      Q    Do you have any documents to show that you missed
5  those hours?  Was your paycheck less?
6      A    I don't remember that.  I would need to -- I can
7  ask my --
8      Q    But you arrived in Chicago on Sunday, correct?
9      A    Right.
10     Q    You didn't work on Sunday.  You weren't scheduled
11 to work that day, right?
12     A    No, I don't remember.
13     Q    So you didn't miss any work on Sunday?
14     A    I don't think so.
15     Q    Do you typically work on Sundays?
16     A    I used to work on Sundays, so -- but when I
17 stopped, I think 2015, I could have covered -- actually I
18 need to check with my manager because I sometimes cover --
19 we cover each other when we're on vacation, so I cannot say
20 100 percent because I could have covered for my co-worker.
21     Q    So you were going to cover for your co-worker and
22 go to the symphony on Sunday?
23     A    She usually -- yeah, my co-worker works almost
24 every Sunday and we -- my office open Sunday many, many

7 (Pages 22 - 25)

Page 30

1  Q  Header 1.
2  A  Yes.
3  Q  If you look at 1.1 it says Plaintiffs incurred the
4  aggregated sum of $6,487.40 per passenger in compensable
5  economic damages, medical bills and inconvenience damages.
6  Can you explain and break down exactly expense by expense --
7  A  I can't.
8  Q  -- how you get to $6,487.40?
9  A  I can't.
10 Q  And what documentation do you have to support your
11 allegations that you suffered $6,487 worth of damages?
12 A  I don't.  I mean, I don't have it.
13 Q  You don't have any?
14 A  No, not at this time.
15 Q  Not of that sum?
16 A  No.  I mean, if it -- depending maybe that our --
17 the cost of our package.  I don't know.  I mean, my husband
18 handles again all the financial documentation but --
19 Q  So you don't know what actual economic damages you
20 have that add up to $6,487.40?
21 A  No.
22 Q  Okay.  If you look at total actual damages,
23 $12,974.80, do you see that below 1.1?
24 A  Yes, right, uh-huh.

Page 31

1  Q  Again can you explain to me how you have
2  $12,974.80?
3  A  I don't know.
4  Q  You can't break down for me expense by expense what
5  you bought that adds up to that amount?
6  A  No.
7  Q  And you have no documentation for that?
8  A  Maybe my husband has.  I don't know.  Me personally
9  I don't.
10 Q  Okay.  And you don't know how you paid for that
11 amount, by cash or credit card?
12 A  Again he does all the, I mean, payments and
13 arrangements, so I personally don't know.
14 Q  Now, if you go to Section 2 which the header's on
15 the first page, it says compensable economic damages there.
16 A  Uh-huh.
17 Q  But if you go to the second page, 2.1, it states
18 that Plaintiff incurred the aggregated sum of $470 for
19 compensable economic damages including but not limited to
20 local per diem transportation, local meals, food stuffs and
21 international telecommunication expenses.  Can you go
22 through and break down expense by expense how you get to
23 $470?
24 A  I will repeat again that I don't -- I'm not the

Page 32

1  financial guru in our family, and my husband paid for
2  everything.  So if it's hotel and transportation and meals,
3  I don't know.
4  Q  But you do understand --
5  A  I cannot --
6  Q  -- that you're a Plaintiff in this action and that
7  these representations of statements of damages are on your
8  behalf, correct?  They're your representations, so I'm
9  asking you how you get to $470.  What are the expenses
10 expense by expense?
11     MR. GOROKHOVSKY:  Counselor, again I think you are
12 misleading her by not explaining to her entire phrase for
13 compensable economic damages including but not limited to
14 local per diem transportation, local meals, food stuff and
15 international telecommunication expenses.
16     MR. DOWLING:  Do you have an objection, Vlad?
17     MR. GOROKHOVSKY:  Yes.
18     MR. DOWLING:  What is it?
19     MR. GOROKHOVSKY:  Vague.
20     MR. DOWLING:  Thank you.  You could have just said that.
21 BY MR. DOWLING:
22 Q  So what were your local per diem expenses?
23 A  What is local per diem?  I don't understand this.
24 Okay.  So --

Page 33

1  Q  Exactly what were all your expenses?  Go through
2  each expense, everything that you bought.  How much was your
3  transportation?  How much was every single meal that you
4  bought?
5  A  So the taxi was -- as stated before was $35 one way
6  and the hotel was 115 -- that I remember -- per one person,
7  and then how much was medication and meals, I assume it was
8  the rest.
9  Q  But you -- do you have any documents to show how
10 much it was worth?
11 A  I don't personally.  Maybe my husband has.
12 Q  Do you have any documents to show your taxi fare?
13 A  Pardon me?
14 Q  Do you have any documents to show your $35 taxi
15 fare?
16 A  Yes.  He should have it.
17 Q  You do?
18 A  I mean, somewhere at home or Helen maybe has it,
19 but at the time --
20     MR. DOWLING:  Will you produce those to us?
21     MR. GOROKHOVSKY:  If given --
22 BY MR. DOWLING:
23 Q  Will you give them to your attorney?
24 A  Pardon me?

9 (Pages 30 - 33)

Page 34

1  Q   Will you give those receipts to your attorney?
2  A   I don't -- no, no, he didn't have --
3  Q   Will you give them to your attorney?
4  A   Oh, will I. If necessary, hopefully I'll --
5  Q   We are asking for them from your attorney. Will
6 you give them to him?
7  A   If he will ask me, yeah, I will give him.
8     MR. GOROKHOVSKY: Sure.
9     MR. DOWLING: So you will ask her?
10    MR. GOROKHOVSKY: You're asking her now, so she'll have
11 to give it to me, I guess.
12    MR. DOWLING: Yeah.
13    MR. GOROKHOVSKY: And I will convey.
14    MR. DOWLING: And you'll give it to us, all the
15 receipts, everything that she has in her possession?
16    MR. GOROKHOVSKY: Yes, if given, yes.
17    THE WITNESS: Hopefully he didn't shred it. Yeah.
18 BY MR. DOWLING:
19  Q  How much was your international telecommunication
20 expense as a result of the delay?
21  A   Yeah, I know. All this phone calls and he did
22 it -- he has all the plans for the T-Mobile. I don't know.
23 I don't know how much. I know we tried to text or call my
24 daughter because everybody was concerned, so we did call and

Page 35

1 I don't remember at the time texting or how we did it. I
2 don't remember, but we need to inform her that we are in
3 trouble and -- because she was expecting to pick us, you
4 know, from the airport, but I cannot unfortunately say how
5 much.
6  Q   Do you know how you paid for it?
7  A   My husband did. I don't know. I mean, oh,
8 probably like when you get a bill from the T-Mobile,
9 probably like that. I don't know.
10  Q   Who is your cell phone provider that you used?
11  A   T-Mobile.
12  Q   T-Mobile?
13  A   I think two years ago, I think so.
14  Q   And you used -- your husband used his cell phone.
15 Did you use yours?
16  A   We had both cell phones. I don't remember now a
17 long time ago who called or text -- I don't remember
18 texting. I think I called. I don't want to mislead you. I
19 don't remember.
20  Q   So you don't know?
21  A   But we had to communicate to let know my family
22 that we're not coming.
23  Q   So you don't know how much you spent on those
24 expenses?

Page 36

1  A   I don't know. Truly I don't.
2  Q   You don't have any documentation to --
3  A   No.
4  Q   -- show how much those were?
5  A   That I don't remember gathering. Maybe he has it
6 like from like paying bills for the cell phone. I don't
7 know.
8  Q   And we talked about this before, but you don't
9 remember exactly what food you purchased during the delay?
10  A   Who can remember that? It was no --
11  Q   Do you have receipts for those?
12  A   For food, I doubt it. I doubt it.
13  Q   Okay.
14  A   No, because he paid cash and no one would give
15 receipt at the -- you know, these places at the airport.
16  Q   So you don't have any documents to show your food?
17  A   I don't think so.
18  Q   Okay.
19  A   My understanding.
20  Q   Did you purchase any drinks while -- during your
21 delay, any beverages?
22  A   My husband did probably. I don't drink.
23  Q   Not just alcoholic, any beverages.
24  A   Oh, yeah, yeah, water and, you know, some drinks,

Page 37

1 yeah. We should be not dehydrating.
2  Q   How much? How much did that add up to?
3  A   I do remember it was pretty expensive for drinks.
4 I don't remember how much, but I just remember that it was
5 kind of -- at the airport all those things expensive, you
6 know, but water was like gold.
7  Q   So you don't know how much it was?
8  A   I don't remember, no.
9  Q   Do you have any documents to show how much your
10 beverages were?
11  A   I doubt it. I doubt it to tell you the truth
12 because --
13  Q   And you haven't produced any documents to your --
14 you haven't given any documents to your attorney regarding
15 your beverages?
16  A   No, I didn't. Maybe he did. I don't know.
17  Q   You didn't give any to your attorney regarding your
18 food?
19  A   I didn't.
20  Q   Or hotel?
21  A   I didn't.
22  Q   Or taxi or any of your claimed expenses; is that
23 correct?
24  A   Yes.

10 (Pages 34 - 37)

Page 46
1  2016 if we -- next year -- I mean, I don't know even how
2  long they're valid.  I don't know.  I even forgot about it
3  completely.
4     Q   So it's your understanding that you received these
5  certificates, though, as a result of the flight from Punta
6  Cana to Chicago?
7     A   But it was given by Apple Vacation, right, not
8  Frontier.
9     Q   Yes, but you received these as a result of that
10 flight, correct?
11    A   Right.
12    Q   From Apple Vacation?
13    A   That's what my understanding is from the delay.
14 I'm really so sorry, but I have obligations.  I'm a grandma
15 and I need to baby-sit my grandchild.  Can you tell me
16 approximately how much longer?
17    Q   I probably have 15 minutes longer.
18    A   Okay.  That's fine.
19    Q   If you go back to Exhibit 3 just for one question.
20    A   Uh-huh.
21    Q   Page 2.
22    A   Uh-huh.
23    Q   Down at the bottom it says total amount of
24 cognizable compensatory damages.  Do you see that?

Page 47
1     A   Yes.
2     Q   29,701.23.  Do you see that?
3     A   Yes, I see that.
4     Q   You can't account or itemize for each and every
5  specific expense you incurred that added up to that amount,
6  can you?
7     A   Maybe for other people on the flight.  I mean, it
8  could be -- I don't know -- collecting all others,
9  passengers, but for me I'm not sure.  It's a big amount.
10    Q   So you don't have -- you can't tell me what every
11 specific expense was that added up to 29,701.23?
12    A   I can't.  I can't.  I can't.
13    Q   And you don't have documents that show an amount
14 that added up to $29,000?
15    A   I can't -- I don't -- I don't have it.
16    Q   Okay.  Take a look at Exhibit 6.  It says amended
17 answer of Plaintiffs Ilya Tarkov and Rimma Tarkov to
18 Defendant's interrogatories.  Do you see that?
19    A   Uh-huh.
20    Q   Do you recognize this document?
21    A   It was some documents, but I didn't have chance to
22 go careful with -- for each page.  My husband just say you
23 need to sign something and I signed.
24    Q   So you've seen this before?

Page 48
1     A   Yeah.  I seen -- I remember signing it, but I did
2  not have chance to go and -- yeah.
3     Q   So you signed it but you didn't review your
4  answers?
5     A   I trust my husband.  I said did you read it.  He
6  said, yes, I did.
7     Q   So you believe these answers to be accurate?
8     A   Yes, I do.  I mean, I believe that he said sign it,
9  it needs to be signed and send to our attorney,
10 Mr. Gorokhovsky.
11    Q   Okay.  If you look at what has been marked as
12 Exhibit 7, it's Plaintiffs' second verified response to
13 Defendant's second set of interrogatories pursuant to
14 Rule 33.  Do you recognize this document?
15    A   What page are you asking?
16    Q   The first page.
17    A   First page.
18    Q   You can just look at that.  Do you recognize this
19 document?  Have you seen this before?
20    A   I don't remember.  I don't remember seeing it.  I
21 didn't sign it when my husband sign it.
22    Q   You didn't sign this document?
23    A   I don't remember.
24    Q   So you never reviewed these answers?

Page 49
1     A   I don't know.
2     Q   So you didn't sign it.  You don't know it to be
3  accurate or truthful?
4     A   I don't know.
5     Q   Now, going to Exhibit 8, Plaintiffs' response to
6  Defendant's request for admission pursuant to Rule 36, do
7  you recognize this?
8     A   No, I don't.
9     Q   So you haven't seen this document before?
10    A   No.
11    Q   So you never reviewed the answers to these
12 questions?
13    A   Who gave me these questions?  I don't remember.
14    Q   They're your responses to our requests for
15 admission.  You've never reviewed this?  You haven't seen
16 this?
17    A   I don't remember seeing this.
18    Q   Okay.  So you don't know -- you wouldn't know if
19 they're accurate?
20    A   Well, the $115, I do remember this number already.
21 It is accurate.
22    Q   Did you review these questions with your attorney?
23    A   MR. GOROKHOVSKY:  Objection, subject to
24 attorney-client --

13 (Pages 46 - 49)

Page 50

1  MR. DOWLING: I'm not asking for specifics.
2  MR. GOROKHOVSKY: -- responsibility and instructing you
3  not to answer.
4  MR. DOWLING: That's an improper objection for the
5  record.
6  MR. GOROKHOVSKY: Move forward.
7  MR. DOWLING: I'm not asking for exactly what you
8  discussed with your attorney. I'm just asking if you did
9  discuss these with your attorney.
10  MR. GOROKHOVSKY: Subject to attorney-client
11  relationship.
12  MR. DOWLING: Are you objecting to that question, did
13  you review these with your attorney?
14  MR. GOROKHOVSKY: I am objecting to the form of the
15  question as it impedes subject matter of attorney-client
16  relationship.
17  MR. DOWLING: Are you instructing her not to answer?
18  MR. GOROKHOVSKY: Yes.
19  BY MR. DOWLING:
20  Q  Okay. Did your attorney ever send these to you?
21  A  Maybe my husband saw it. I didn't.
22  Q  You never saw it?
23  A  I'm so busy with my grandchild who's having issue.
24  Q  But you never saw it, though?

Page 51

1  A  I didn't.
2  Q  Okay. Have you ever filed a lawsuit prior to this
3  one?
4  A  Pardon me?
5  Q  Have you ever filed a lawsuit prior to this
6  lawsuit?
7  A  Me file the law --
8  Q  Have you ever filed one prior to this?
9  A  Never, never ever.
10  Q  Just give me one second. Just a couple more
11  questions. It shouldn't take long.
12     Ms. Tarkov, you recalled the 115 for the hotel
13  and the $35 for the taxi?
14  A  One way, yeah.
15  Q  One way. So that would be $70 for the taxi. Do
16  you recall any other expenses specifically, the amount of
17  any other expense?
18  A  Other than food, beverages, medications. It was
19  not too much time to incur other, you know --
20  Q  Okay. And do you recall the specific amount of any
21  of those other, the food --
22  A  Unfortunately I don't.
23  Q  Okay. Your flight on March 21st from Chicago to
24  Punta Cana, how was that flight?

Page 52

1  A  Frontier always has delays. I still use this
2  airline, but after this incident I said maybe no more but I
3  stay -- I mean, because it's the only option when you go
4  places but --
5  Q  Specifically March 21st.
6  A  -- the 21st I don't remember. It was some delay,
7  not bad one but it was a few hours. We had to -- the kids
8  were waiting in Punta Cana. It's my daughter and
9  grandchildren and they were sending a car to -- and I know
10  that my daughter was texting me where are you. I mean, so
11  it was some delay but I don't recall how long.
12  Q  Did you have any expenses that resulted from that
13  delay, actual economic expenses?
14  A  I understand. Maybe some meals that we bought
15  because we got hungry. I don't recall. It was, you know,
16  two years ago.
17  Q  Do you recall how much your -- any meals would have
18  been?
19  A  I don't remember an exact amount, but it was not
20  significant, you know.
21  Q  Any receipts or other documentation?
22  A  No, I don't think so, but my husband could have,
23  you know, collected, but I didn't.
24  Q  Do you know how they were paid for?

Page 53

1  A  Cash. He usually tries to -- he takes cash with
2  him.
3  Q  And that cash would have came from your joint
4  checking account, right?
5  A  Yes. He would take money.
6  Q  You don't take cash -- you don't get cash from any
7  other source but that checking account, right?
8  A  Checking account?
9  Q  Yeah. You don't have any other source of cash?
10  A  Oh, I wish. No, we don't. No, we don't, just
11  whatever we work -- you know, get salary and that's all.
12  Q  So every expense related to this delay from Punta
13  Cana to Chicago and from Chicago to Punta Cana that you paid
14  for in cash --
15  A  Uh-huh.
16  Q  -- you would have taken that cash out of your
17  checking account?
18  A  That's true.
19  Q  Okay. And would you have taken that out around in
20  March before your trip?
21  A  My husband usually goes to bank before we go
22  anywhere to get, you know, cash to be safe. Some places do
23  not take credit cards.
24  Q  So your statements, your checking account